The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Young and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence. The Full Commission REVERSES the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff-employee and defendant-employer at all relevant times herein.
3. Defendant was a duly qualified self-insured at all relevant times herein.
4. Plaintiff's average weekly wage yields the maximum compensation rate for 1997, $512.00 per week.
5. The parties stipulated into evidence plaintiff's personnel file.
6. The parties stipulated into evidence plaintiff's recorded statement.
7. The parties stipulated into evidence plaintiff's and defendant's discovery responses.
8. The parties stipulated into evidence plaintiff's W2 forms for 1999.
9. The parties stipulated into evidence all of plaintiff's medical records from Triangle Orthopaedic Associates, P.A., Durham Regional Hospital, Durham Clinic, P.A., Durham Internal Medicine Associates, P.A., Cary Psychology, Inc., and Piedmont Care.
10. The issues presented are:
 a) Whether plaintiff contracted the occupational disease of workplace stress/depressive disorder as a result of his employment with defendant?
 b) Whether plaintiff is entitled to any benefits under the North Carolina Workers' Compensation Act?
 ***********
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 49 year old high school graduate with an Associate Degree from Durham Community College.
2. Plaintiff worked for defendant from 1974 until October 1, 1998. From 1974 through 1984, plaintiff worked as a public safety officer performing both police and fire protection. From 1984 through the date of his retirement, plaintiff worked full-time for defendant as a police officer.
3. Plaintiff was an officer on uniformed patrol in a marked car primarily in districts three and four, which were city districts with heavy crime and a large volume of calls and arrrests.
4. Plaintiff began having problems dealing with his work as a uniformed police officer on the streets. He requested a transfer from his supervisors, which was refused. By 1997 plaintiff felt that he could no longer cope with working on the street and experienced several episodes when he pulled to the side of the road crying. Plaintiff also put a gun to his head and pulled the hammer. Plaintiff stated that he was unsure why he did not fire the gun.
5. In January 1997 plaintiff was hospitalized for chest pains following an argument over job performance with his supervisor, Sargeant LeBarge. Plaintiff's condition continued to deteriorate and he felt nervous all the time. Beginning in March 1997 plaintiff took administrative leave with pay pending a fitness for duty evaluation. Plaintiff sought assistance from defendant's Employee Assistance Program, which referred him to Dr. Robert E. Winton, a psychiatrist.
6. Plaintiff began treating with Dr. Winton in April 1997. Plaintiff reported to Dr. Winton that he had been working as a uniformed officer on the street for 23 years and that he was having trouble maintaining his professional focus. Dr. Winton said that the factors identified by plaintiff as contributing to his stress were the combination of his work on the street and the lack of support by his supervisors. Dr. Winton felt that plaintiff had a depressive disorder, but plaintiff was reluctant to take medication for this condition.
7. Dr. Winton testified that plaintiff described working on the street as an uniformed officer as becoming increasingly difficult due to the declining respect citizens have for police officers. Plaintiff was cursed and spat upon while working on the street. Dr. Winton also stated that plaintiff was frustrated with defendant's promotion process in that he was repeatedly passed over for promotions by less experienced officers.
8. Plaintiff continued to be on administrative leave. In September 1997 he expressed to Dr. Winton an interest in returning to work in the downtown patrol. Being on downtown patrol meant that plaintiff would not be riding in a marked police car, but would be either on foot or riding a bicycle. Plaintiff believed downtown patrol would not subject him to the same stressors as his previous work on the street. Dr. Winton also felt that the downtown patrol job would be a better environment for plaintiff since "he [plaintiff] wasn't even in a car so it wasn't this business of responding to wrecks, seeing dead bodies . . . sites of murders, all this stuff he was beginning to have trouble with. . . . having people enraged at him." Dr. Winton added that on downtown patrol, plaintiff would also avoid "(g)oing to domestic disturbances where they attack him verbally." Plaintiff's request for assignment to the downtown patrol was not granted.
9. Plaintiff returned to work for defendant in December 1997 as an administrative assistant to a police captain. Dr. Winton testified that plaintiff's symptoms improved by June 1998 due to his new work environment and the absence of the stressors of the street.
10. Dr. Winton wrote a letter, dated June 5, 1998, to Chief of Police Chambers stating that plaintiff had been working in a light duty capacity for the past 27 weeks and was clearly able to do useful work for defendant in this capacity. Dr. Winton also stated that "(f)ront line police work ("on the street"), from (his) perspective, has unpredictably intense emotional demands on those who do it." Dr. Winton further stated that he was "of the opinion that putting Mr. Acker in such potential situations would create an unacceptable risk situation."
11. As a police officer, plaintiff was required to be able to perform all aspects of the job. Because plaintiff was unable to be on uniform patrol on the street, defendant notified plaintiff in August 1998 that he was being medically displaced from his employment with defendant. Plaintiff worked for defendant until October 1, 1998. Defendant never offered alternative employment to plaintiff. Plaintiff applied for disability retirement through the State of North Carolina and his retirement became effective on October 1, 1998.
12. On April 22, 1998 plaintiff filed an Industrial Commission Form 18, alleging compensable workplace stress disorder.
13. Dr. Winton continued to treat plaintiff, but with less frequency after he retired from defendant. Dr. Winton's last treatment of plaintiff in the records was on May 2, 2000, at which time plaintiff was continuing to improve. Dr Winton testified that plaintiff would never be able to return to work as a uniformed officer on the street.
14. Plaintiff was also evaluated by Dr. Lee Walker, a psychologist with Cary Psychology. Dr. Walker also found that plaintiff was not capable of performing his enforcement duties as a police officer due to his depression.
15. Dr. Winton was the only medical expert deposed in this case. Dr. Winton concluded and the Commission finds that plaintiff's employment with defendant placed him at an increased risk of developing depression as compared with members of the general public and was in fact a significant causal factor in the development of his depression.
16. Since 1981 plaintiff has engaged in secondary employment as a tractor-trailer driver with various trucking companies. Plaintiff continued working part-time for trucking companies through the date of the hearing before the Deputy Commissioner. Following his retirement from defendant, plaintiff typically works 2-3 days per week as a truck driver. At the hearing before the Deputy Commissioner, plaintiff stated that he could work more days per week but that the amount he can earn was limited by retirement system regulations. Plaintiff's W-2 statements from 1999 showed that he earned a total of $13,424.57 from three employers during the tax year.
17. Following his retirement from defendant, plaintiff's health has improved, he is taking no medications for depression, and returns to Dr. Winton only on a quarterly basis. Plaintiff is also taking welding and computer courses at Piedmont Community College.
18. As a result of his compensable depression, plaintiff was disabled from employment with defendant during the period from September 1, 1997 through December 1, 1997. As of December 1, 1997 plaintiff was able to work full-time in the administrative assistant job until he was medically discharged and retired on October 1, 1998. Thereafter, although plaintiff could not return to work as a police officer, he retained wage earning capacity. Plaintiff admitted at the hearing before the Deputy Commissioner that he was able to work. Dr. Winton stated, and the Commission finds, that plaintiff is capable of working, in that the only job plaintiff could not perform, according to Dr. Winton, is the uniformed officer on the street.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. In order to establish the existence of an occupational disease, a plaintiff must prove three elements: (1) there must be proof of a causal connection between the disease and the employment; (2) the disease must be characteristic of a trade or occupation; and (3) the disease must not be an ordinary disease of life to which the public is equally exposed outside of employment. N.C. Gen. Stat. § 97-53(13); Perry v.Burlington Industries, Inc., 80 N.C. App. 650, 343 S.E.2d 215 (1986), citing Hansel v. Sherman Textiles, 304 N.C. App. 44, 283 S.E.2d 101
(1981).
2. Depression has been recognized as a compensable occupational disease of police officers under the Workers' Compensation Act. Pulleyv. City of Durham, 121 N.C. App. 688, 468 S.E.2d 506 (1996); Baker v.City of Sanford, 120 N.C. App. 783, 463 S.E.2d 559 (1995); Harvey v.Raleigh Police Dept., 85 N.C. App. 540, 355 S.E.2d 147, disc. rev.denied 320 N.C. 631, 360 S.E.2d 86 (1987).
3. As of January 30, 1997 plaintiff developed depression which was an occupational disease due to causes and conditions characteristic of and peculiar to his employment and which was not an ordinary disease of life to which the general public was equally exposed. Rutledge v. TultexCorp., 308 N.C. 85, 301 S.E.2d 359 (1983); Booker v. Medical Center,297 N.C. 458, 256 S.E.2d 189 (1979).
4. In cases where there is no agreement as to the liability of a defendant in a claim for compensation, plaintiff has the burden of showing that he is unable to earn the same wages that were earned prior to the injury, either in the same or other employment. Plaintiff can meet his burden in one of four ways: (1) by producing medical evidence that the employee is incapable of work in any employment; (2) with evidence that the employee is capable of some work, but after reasonable effort, has been unable to obtain employment; (3) with evidence that the employee is capable of some work but due to other factors such as age, education, inexperience, etc., seeking work would be futile; or (4) with evidence that the employee is employed at a wage less than that earned prior to the injury. Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993).
5. In this case plaintiff has failed to meet his burden of showing continuing disability. Plaintiff did not present any evidence from a medical expert that he is unable to work in any employment. In addition, plaintiff admitted at the hearing before the Deputy Commissioner that he was able to work. Plaintiff has not made a reasonable effort to obtain employment, other than his secondary employment as a truck driver. Plaintiff's age, education, experience and training do not render a search for employment futile. For these reasons, plaintiff is not entitled to continuing total disability compensation after his job with defendant ended on October 1, 1998. Id.
6. As a result of his compensable occupational disease, plaintiff was totally disabled and is entitled to temporary total disability compensation at the rate of $512.00 per week for the period from September 1, 1997 through December 1, 1997. N.C. Gen. Stat. § 97-29. After December 1, 1997 and continuing, plaintiff retained wage earning capacity and was no longer disabled under the Workers' Compensation Act.
7. Plaintiff is entitled to have defendant provide all reasonably necessary medical treatment related to plaintiff's compensable occupational disease to the extent the treatment tends to effect a cure, give relief or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-25, -59.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $512.00 per week for the time period from September 1, 1997 until December 1, 1997. This amount has accrued and shall be paid in a lump sum subject to the attorney's fee approved below.
2. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his occupational disease of depression when bills for the same are submitted to and approved by the Commission.
3. A reasonable attorney's fee of twenty-five percent of the accrued compensation due plaintiff is approved for plaintiff's counsel and shall be paid directly to plaintiff counsel.
This the ___ day of November 2001.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/mhb